**TENANTS AND OWNERS IN OPPOSITION TO REDEVELOPMENT ("TOOR") et al., Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT ("HUD") et al., Defendants.**

**No. C–69 324 SAW.**

United States District Court,
N. D. California.

Nov. 6, 1975.

See also, D.C., 406 F.Supp. 1024.

Steinhart, Goldberg, Feigenbaum & Ladar, Michael R. Marron, Robert T. Fries, San Francisco, Cal., for petitioners San Francisco Neighborhood Legal Assistance Foundation and Legal Aid Society of Alameda County.

Henry F. Davis, Michael A. DiSanto, Steven F. Nord, San Francisco, Cal., for respondent San Francisco Redevelopment Agency.

MEMORANDUM DECISION AND ORDER DISMISSING THE MOTION OF PETITIONERS FOR ATTORNEYS' FEES

BOLDT, Senior District Judge, Sitting by Designation.

I. BACKGROUND OF THE LITIGATION:

In an effort to rehabilitate a blighted area within San Francisco, application was made to the Federal government for loans and grants to redevelop the affected area. Defendant San Francisco Redevelopment Agency applied for the funds and played an integral role in planning the project. The Federal government provided the requested aid and defendant agency began to implement the redevelopment plan. On November 5, 1969 plaintiffs, a group of tenants and owners of property within the development area, filed a complaint seeking various relocation benefits and subsidies available to displaced persons. Plaintiffs were represented by San Francisco Neighborhood Legal Assistance Foundation (SFNLAF) although certain attorneys of the Foundation who represented plaintiffs later became associated with Public Advocates, Inc., a private law-firm, and others with the Legal Aid Society of Alameda County (LASAC). On April 30, 1970 a preliminary injunction issued against defendant San Francisco Redevelopment Agency and the United States Department of Housing and Urban Development, compelling defendants to provide the relocation relief sought by plaintiffs.

II. BACKGROUND OF THE MOTION FOR ATTORNEY'S FEES:

At a hearing on December 19, 1974, upon a motion for attorneys' fees sought by SFNLAF and LASAC, a potential conflict of interest was presented to the presiding judge, Stanley A. Weigel. Judge Weigel expressed great concern at the possibility of his having a conflict of interest of which he had no previous knowledge. Finally concluding that he should recuse himself from the proceeding and vacate all orders previously entered therein by him, he did so by an order entered February 10, 1975, in which the proceeding on attorneys' fees was returned to Chief Judge Oliver J. Carter for designation to a successor judge.

Judge George H. Boldt was so designated by Chief Judge Carter. By an order entered May 7, 1975 Judge Boldt set forth the parameters of his jurisdiction in the proceeding.

There appears to be some doubt as to the proper interpretation of the May 7th order regarding the status of Public Advocates, Inc. Judge Weigel entered an order January 30, 1974 approving an award of attorneys' fees to Public Advocates, Inc. and directing it to negotiate a reasonable fee with defendant San Francisco Redevelopment Agency. Those parties agreed on a figure and filed a stipulation thereon with the Court on May 28, 1974. It has been and still is the position of the undersigned Judge that the matter of attorneys' fees to Public Advocates, Inc. from San Francisco Redevelopment Agency has been previously adjudicated and review thereof is now pending. In the above circumstances, this Court is satisfied it does not have jurisdiction in any particular over the Public Advocates proceeding.

Respondent having brought to the attention of the Court the recent United States Supreme Court decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (*Alyeska*); the parties were authorized by a memorandum dated June 17, 1975 to submit briefs concerning the effect of that decision on petitioners' motion for attorneys' fees in this proceeding. Although petitioners SFNLAF and LASAC acknowledged that the private attorney general theory was no longer available to them, they requested and were granted leave to rely on and brief the applicability of the common fund and bad faith rationales to the facts of this case by an order dated July 30, 1975. The matter has now been fully briefed and considered by the Court.

III. ISSUES:

A. Is there any statutory provision permitting or precluding an award of attorneys' fees under the facts of this case?

B. If not, under the facts and circumstances of this proceeding can attorneys' fees be awarded under any recognized exception to the general American rule precluding such awards?

C. If so, does the fact that petitioners are legal aid offices, wholly or partially supported by federal funds, act as a bar to an award of attorneys' fees?

IV. HISTORICAL BACKGROUND OF AMERICAN RULE AND EXCEPTIONS:

The prevailing American rule is that each party must be responsible for payment of attorneys' fees regardless of the outcome of the litigation. The following exceptions to the general rule have been authorized or recognized: (1) where a statute authorizes a grant of attorneys' fees; (2) where there is an enforceable contractual obligation; (3) where a common fund has been created such that non-contributing beneficiaries are unjustly enriched; (4) where obdurate behavior occurs; (5) or where there is a finding that a litigant has acted as a private attorney general. *Alyeska, supra*; see *Incarcerated Men of Allen County Jail v. Fair*, 507 F.2d 281 (6th Cir. 1974); *Merola v. Atlantic Richfield Company*, 493 F.2d 292 (3rd Cir. 1974); *International Ass'n of M. & A. W. L. No. 1194 v. Sargent Indus.*, 63 F.R.D. 623 (N.D.Ohio 1974); *La Raza Unida v. Volpe*, 337 F.Supp. 221 (N.D. Cal.1971). An additional ground for the grant of attorneys' fees lies in the general equity power of the court. *Sprague v. Ticonic Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

The unique circumstances of this litigation coupled with petitioners' motion for attorneys' fees, necessitates an examination of the current status of the various exceptions to the American rule. Although petitioners assert the applicability of the common fund and bad faith exceptions and acknowledge the demise of the private attorney general doctrine in the *Alyeska* decision, scrutiny of all three is important to an understanding of the present decision.

**964**

## V. DISCUSSION OF ISSUES:

### A. *Statutory Provisions*:

As noted in Judge Weigel's order of January 30, 1974 the National Housing Act of 1949, *as amended* 42 U.S.C. § 1441 *et seq.*, the policy and provisions of which were vindicated by plaintiffs' suit, makes no allowance for an award of attorneys' fees. Neither is there a provision precluding such fees. In short, there is no statutory provision available for guidance in resolving this dispute.

### B. *Alleged Exceptions to the American Rule*:

#### 1. *Bad Faith*:

█ An award of attorneys' fees to the successful party is justified in a case where the opponent has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." 6 J. Moore, *Federal Practice* ¶ 54.77[2], p. 1709 (2d ed. 1972) (footnote omitted).

In *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1972), the Supreme Court provided that,

". . . the underlying rationale of 'fee shifting' is, of course, punitive, and the essential element in triggering the award of fees is therefore the existence of 'bad faith' on the part of the unsuccessful litigant." 412 U.S. at 5, 93 S.Ct. at 1946.

Petitioners cite six occurrences or reasons allegedly justifying an award of attorneys' fees pursuant to the bad faith exception: (1) respondent's motion to dissolve the preliminary injunction entered April 30, 1970; (2) petitioners' efforts to seek contempt citations for respondent's relocation efforts; (3) respondent's submission of an inadequate relocation plan; (4) respondent's motion to disqualify Judge Weigel; (5) the numerous entries on the docket sheets in the case; and (6) because respondent, a public agency, allegedly reacted to this litigation in a manner unbefitting its public status. [Pet. Memo pp. 9–11]. Petitioners then contend that considering the litigation in its entirety, the

above cited circumstances constitute "cumulatively unjustifiable" behavior. [Pet.Memo p. 8].

█ This Court is satisfied that the total of the cited incidents and circumstances of respondent's alleged irregular conduct is not sufficient to authorize an award of attorneys' fees to petitioners based on the bad faith exception. At most, some of the activities referred to might have justified an application to the trial court for reimbursement of time and expense allegedly expended by petitioners unnecessarily. A distinction must be drawn between intermittent, burdensome or dilatory conduct by a party opponent, of the kind asserted by petitioners, and long continued, unreasonably obstinate, wanton or wilfully oppressive conduct which may be found sufficient to require a finding of bad faith or obdurate behavior.

Vigorous advocacy involves conflict and is a natural and expected by-product of litigation in our judicial system. It is only conduct that clearly goes beyond generally accepted vigor and persistence commonly employed in our adversary system that may be considered in determining whether sanctions should be imposed. It is the opinion of this Court that the evidence offered by petitioners does not sustain their burden of proof sufficiently to justify imposing the punitive sanction of requiring assessment of attorneys' fees against respondent.

#### 2. *Common Fund—Private Attorney General*:

█ Where a plaintiff, suing in a representative capacity, creates or preserves a fund, the benefits of which are shared by others, federal courts have generally permitted deduction of attorneys' fees from the fund so as to apportion the costs among the beneficiaries. *Alyeska, supra; Trustees v. Greenough,* 105 U.S. 527, 26 L.Ed. 1157 (1881); *Gilpin v. Kansas State High School Activities Ass'n, Inc.,* 377 F.Supp. 1233 (D.Kan.1974), (*Gilpin*).

In *Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), the Supreme Court expanded the common fund exception to the American rule by providing:

> "The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale."
>
> \* \* \* \* \* \*
>
> "Other cases have departed further from the traditional metes and bounds of the doctrine, to permit reimbursement in cases where the litigation has conferred a *substantial benefit* on the members of an *ascertainable class*, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to *spread the costs proportionately among them*." 396 U.S. at 392–94, 90 S.Ct. at 625. (emphasis added).

In *Mills*, the Supreme Court authorized an examination into the services rendered and results achieved in particular litigation to determine if a "substantial benefit" had been bestowed. It is this same benefit analysis which provided a basis for the development of the private attorney general exception; i. e. that a public benefit had resulted from enforcement of public policy. The encouragement of public benefit litigation, including representation of persons with limited financial resources, is a related basis for an award of attorneys' fees pursuant to the private attorney general doctrine. *Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); *Gilpin, supra*, and cases cited therein.

█ In *Alyeska, supra*, the Supreme Court abrogated the private attorney general exception to the basic American rule which does not authorize awarding of attorneys' fees and affirmed the principle that "encouragement of private action to implement public policy" is a matter for legislative, rather than judi-cial determination. Since *Alyeska, supra*, it is improper for a federal court to award attorneys' fees where a litigant "(1) furthers the interests of a significant class of persons by (2) effectuating a strong congressional policy." *Brandenburger v. Thompson*, 494 F.2d 885, 888 (9th Cir. 1974).

Petitioners' contentions that their successful litigation "benefits a class of persons much broader than those included within plaintiff's community group" and that a "minority group of San Francisco citizens succeeded in vindicating rights under the National Housing Act which go to the betterment of the city as a whole" certainly appear to be the private attorney general rationale, [Pet. Memo p. 6], and bring to mind the well established principle that the law will not permit a party to do indirectly that which the party is precluded from doing directly. See *Samuel v. University of Pittsburgh*, 395 F.Supp. 1275, 1282 (W.D.Pa.1975).

█ Since petitioners' efforts did not produce a "discrete monetary fund" they seek attorneys' fees based on the non-pecuniary benefit analysis of *Mills*. Under that decision petitioners may recover fees where (a) a *"substantial benefit"* has been conferred (b) on an *"ascertainable class"* and (c) where the court's jurisdiction "makes possible an award that will operate to *spread the costs proportionately among them*." *Mills, supra*, 36 U.S. at 393–94, 90 S.Ct. at 626. The Court does not find any of those requisites to be established in this instance for the following reasons:

(a) *Substantial Benefit.*

The provisions for relocation housing and subsidies most directly benefited the plaintiffs and others similarly situated. Those persons most able to directly and substantially benefit from this litigation have not in fact sought those benefits in any significant numbers as evidenced by the fact that only 100 of the estimated 2575 residents have sought the benefits of this litigation. [Tr. 3/4/75 p. 105,

l. 8–9; p. 114, l. 7–11; p. 116, l. 17–21; Tr. 3/14/75 p. 56, l. 22]. On the other hand, the benefit bestowed upon the residents of the city and county of San Francisco as a result of petitioners' efforts can at best be described as indirect and uncertain. Indeed the intended beneficiaries of the overall project, the Yerba Buena Center Redevelopment Project, were all the residents of the city and county of San Francisco. On the record before the Court the relocation relief secured by petitioners for residents of the blighted area did not substantially augment the benefits to be received through the Yerba Buena Center Redevelopment Project. In sum, a substantial benefit due to petitioners' services has been enjoyed by only a relatively few direct beneficiaries, and such benefits are of a nature that all residents of San Francisco have not benefited significantly therefrom.

(b) *Ascertainable Class*

The direct beneficiaries of this litigation are the estimated 2,575 individuals who resided within the Redevelopment Project area and secured relocation rights and subsidies. As stated above, only about 100 persons have taken advantage of the relocation benefits according to the latest information presented to the Court. [Tr. 3/4/75, p. 105, l. 8].

The indirect beneficiaries, the residents of the city and county of San Francisco, can be deemed ascertainable only in the sense that their total number may be accurately determined. The problem is to fix a date or time frame which approximates the benefit bestowment period and to determine the number and identity of the city/county beneficiaries; which appears to be an impossible task. Certainly, the difficulties of determining the number, identity and extent of benefit is far more difficult than in determining the numbers and identities of union members or shareholders, which the cited common benefit cases involve.

(c) *Cost Apportionment*

There are at least two degrees of beneficiaries in this litigation: The Yerba Buena redevelopment area residents and all the residents of the city and county of San Francisco. That the benefits accruing to one group are different, at least in character and extent, from the benefits accruing to the other group cannot be disputed.

Because of the prohibition against taxing costs against the United States government, petitioners seek recovery of their costs from defendant San Francisco Redevelopment Agency which is funded in great part by loans and grants from various federal agencies. [Tr. 3/4/75 p. 95, l. 23 *et seq.*; Tr. 3/14/75 p. 60, l. 24 *et seq.*]. To tax costs against a federally funded agency broadens the base from which tax monies are drawn to pay for benefits accruing to the residents of the city and county of San Francisco. To apply federal funds to petitioners' costs is to create a situation where taxpayers not residing in the city or county of San Francisco are forced to pay for benefits which they can never conceivably enjoy. This is the antithesis of the rationale for awarding attorneys' fees under the common fund-benefit doctrine.

Even assuming it was possible to apportion out of federal monies those tax dollars paid by San Francisco residents, there is a wide disparity in the benefits received by the various residents and in the amount of taxes paid by such persons. For example, the former residents of the Yerba Buena redevelopment area are presumably persons of limited means who received the major benefits of this litigation yet whose tax dollar input was much less than citizens or residents of greater means. Indeed, the direct beneficiaries are the least able to pay for their representation.

In commenting on the limitations of the common fund-benefit exception the court in *Seaman v. Spring Lake Park*

*Ind.Sch. Dist. No. 16,* 387 F.Supp. 1168 (D.Minn.1974), stated:

> "It is ill suited to equitable actions against governmental bodies or officials." 387 F.Supp. at 1174.

In discussing the impact of *Mills, supra,* upon the common fund doctrine, the court in *Gilpin, supra,* provided:

> ". . . *Mills* was not intended to permit carte blanche assessment of attorneys' fees as costs to a successful litigant in every case merely because statutory policy was vindicated and others not party to the litigation were indirectly benefited thereby in some nebulous manner. . . . The decision in *Mills* was premised, at least in part, upon the doctrine of unjust enrichment. Accordingly, in the strictest sense *Mills* sanctions 'fee-shifting' only so long as the class actually taxed has in fact benefited from the suit in some appreciable manner." 377 F. Supp. at 1246–47. See also *Seaman v. Spring Lake Park, supra, La Raza Unide, supra.*

None of the decisions cited by petitioners go so far as to permit an award of attorneys' fees under such facts. The cases involve "substantial benefits" enjoyed by an "ascertainable class" which benefits can be apportioned among the beneficiaries. *Mills, supra,* was a shareholder derivative suit invalidating a merger based upon a misleading proxy statement. The beneficiaries were the shareholders, a specific group among which to apportion costs. *Hall v. Cole, supra,* involved a suit by a union member to enforce provisions of the Labor Management Reporting and Disclosure Act. The beneficiaries were the union members, an ascertainable class among whom the costs could be evenly taxed. *Yablonski v. United Mine Workers of America,* 151 U.S.App.D.C. 253, 466 F. 2d 424 (1972), is another union member benefit case as is *Blankenship v. Boyle,* 337 F.Supp. 296 (D.D.C.1972). *Brewer v. School Board of City of Norfolk, Virginia,* 456 F.2d 943 (4th Cir. 1972) *cert.* denied, 406 U.S. 933, 92 S.Ct. 1778, 32 L.Ed.2d 136, is deserving of special mention. In that case plaintiffs secured free busing privileges for certain students of the defendant school district. The court valued the students' benefit at $60.00 per student per year. Rather than tax attorneys' fees and costs against the students, thus diminishing the value of the intangible benefit received, the court directed the defendant school district to pay those costs. The *Brewer* court acknowledged that the award of fees was based upon a "quasi-application" of the common fund exception. The *Brewer* case is unique in its extension of the common fund theory and no comparable decision has been reported since 1972.

For the above reasons this Court finds and holds that an award of attorneys' fees to petitioners cannot be made on the common fund-benefit exception to the general American rule.

### 3. *Inherent Equity Power*

As noted previously, the Court has the power to award attorneys' fees when "overriding considerations indicate the need for such a recovery." *Mills, supra.* Even the application of *recognized* exceptions to the American rule is confined to "those unique and special cases involving 'compelling circumstances' and 'overriding considerations of justice,' where to deny allowance would result in 'gross injustice.'" *Brewer, supra* at 948 (footnotes omitted).

If the facts and circumstances referred to in the previous paragraph were found established in the present case, this Court would not hesitate to grant an award of attorneys' fees to petitioners. Unfortunately for them, the Court, in good conscience must find and hold that the facts and circumstances in this case are not sufficiently compelling to justify an award of attorneys' fees.

### C. *Funding Status of Petitioner*

Both LASAC and SFNLAF were budgeted, either wholly or partial-

968

ly, with federal funds disbursed and controlled by the Office of Economic Opportunity. [Tr. 3/14/75 p. 3, l. 7; p. 10, l. 1 *et seq.*]. Attorneys for petitioners were paid a salary and the various other costs incurred in this litigation were absorbed by petitioners as business operating costs. Their clients were not and are not obligated to pay the fees and costs now sought by petitioners. That fact militates against the award of fees based upon the common fund-benefit exception. The common fund-benefit exception was created to prevent situations where a plaintiff would secure benefits for others yet have to bear all the costs of the litigation, resulting in the non-contributing beneficiaries being unjustly enriched. In the present case petitioners' clients are not obligated to pay the costs of litigation, and therefore, although others are benefited, no one has been *unjustly* enriched.

If an exception to the American rule had been found established in this instance, the Court would have had to consider and determine whether or not attorneys' fees can properly be awarded to publicly funded legal aid organizations. This question is not now presented in view of the above stated rulings of the Court.

## VI. *CONCLUSION*

Denial of petitioners' motion for an award of attorneys' fees should not be taken as the slightest reflection upon the quality and effectiveness of their legal services. However, after full and careful review of the evidence presented and the controlling legal authorities, this Court is satisfied that petitioners have not established by a preponderance of the evidence any legally recognized basis for an award of attorneys' fees to them; accordingly, petitioners' motion therefor must be and hereby is denied on the merits and with prejudice.